WYOMING FARM BUREAU FEDERA-
TION, et al., James R. and Cat D. Urbig-
kit, National Audubon Society, et al.,
Plaintiffs,

v.

Bruce BABBITT, in his official capacity
as Secretary of the Department of
Interior, et al., Defendants.

Civil Nos. 94–CV–286–D, 95–CV–
027–D and 95–CV–1015–D.

United States District Court,
D. Wyoming.

Dec. 12, 1997.

William Perry Pendley, Todd S. Welch, Steven J. Lechner, Denver, CO, John J. Rademacher, Richard L. Krause, American Farm Bureau Federation, Park Ridge, IL, for Plaintiffs.

Kim D. Cannon, Kate M. Fox, Davis & Cannon, Cheyene, WY, Thomas M. France, Nancy Powell, National Wildlife Federation, Missoula, MT, George Burnett, Western Environmental Law Center, Taos, NM, Timothy W. Miller, Casper, WY, for Intervenor National Wildlife Federation.

Kim D. Cannon, Kate M. Fox, Davis & Cannon, Cheyene, WY, Thomas M. France, Nancy Powell, National Wildlife Federation, Missoula, MT, George Burnett, Western Environmental Law Center, Taos, NM, for Intervenors Defenders of Wildlife, Wyoming Wildlife Federation, Idaho Wildlife Federation, Wolf Educ. and Research Center.

Carol A. Statkus, Asst. U.S. Atty., Donald R. Wrobetz, U.S. Atty's Office, Cheyenne, WY, Christiana P. Perry, James C. Kilbourne, Dept. of Justice, Washington, DC, for Defendants.

Kim D. Cannon, Kate M. Fox, Davis & Cannon, Sheridan, WY, Thomas M. France, Nancy Powell, National Wildlife Federation, Missoula, MT, Grove Burnett, Western Environmental Law Center, Taos, NM, for Amicus The Wolf Fund, Taylor Outfitters.

## ORDER

DOWNES, District Judge.

The above-captioned matter comes before the Court on Plaintiffs' appeal[1] of Defendants' decision to introduce an "experimental population" of gray wolves in Yellowstone National Park and central Idaho. The Court, having carefully reviewed the administrative record and the various parties' memoranda, having heard oral argument of counsel and being fully advised in the premises, FINDS and ORDERS as follows:

### BACKGROUND

The gray wolf (*canus lupus*) was extirpated from the western portion of the United States in the early 1900's. In 1973, pursuant to the Endangered Species Act (hereinafter "ESA"),[2] the Secretary of the Interior listed the Northern Rocky Mountain Wolf (*canis lupus irremotus*) as an endangered species. In 1978, the Secretary listed the entire species of *canus lupus* as an endangered species in the lower 48 states, except in Minnesota where it was listed as a threatened species.[3]

Between approximately 1940 and 1986, no wolf reproduction was detected in the Rocky Mountain states. However, a wolf den was discovered in Glacier National Park in 1986. This colony has since grown to approximately seventy wolves. Defendants acknowledge that, as the number of wolves in Montana increases, wolves will naturally recolonize areas of Idaho and Yellowstone. (*See* Admin.Rec. II.A.3, Final Environmental Impact Statement ("FEIS"), at 4–58, and 6–84 through 6–94.) In recent years, lone wolves have been confirmed to exist south of this area within the Yellowstone and central Idaho experimental population areas. (*See* Admin.Rec. II.I.1(7); II.I.1(6); II.K.3(4); II.K.3(5); II.K.3(6); VII.5; and VIII.3.)

In accordance with § 1533(f) of the ESA, the Department of the Interior established a team to develop a recovery plan for the Northern Rocky Mountain Wolf. The Northern Rocky Mountain Wolf Recovery Plan[4]

---

**1.** Under *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1579–80 (10th Cir.1994), this Court is required to process this case as an appeal and must govern itself by referring to the Federal Rules of Appellate Procedure.

**2.** 16 U.S.C. §§ 1531–44 (1973 & Supp.1994).

**3.** The ESA defines an "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range...." 16 U.S.C. § 1532(6). A "threatened species" is defined as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

**4.** The 1980 Plan states that it deals only with the subspecies *irremotus,* and does not address the entire wolf species. At the time the Plan was

was completed in 1980 and was "intended to provide direction and coordination for efforts toward the recovery of at least two viable [Northern Rocky Mountain Wolf] populations in the lower 48 states." (1980 Plan at iii.) The plan was updated in 1987. The 1987 Northern Rocky Mountain Recovery Plan concluded that a population of about 300 wolves was required in order for the species to recover in areas of the western United States from which it had been eliminated. The 1987 Plan recommended that the introduced population consist of at least ten breeding pairs for three consecutive years in each of three recovery areas (northwestern Montana, central Idaho and Yellowstone National Park). (1987 Plan at 12.) Natural recovery was recommended in the Idaho and Montana areas, while the establishment of a nonessential experimental population was recommended for Yellowstone National Park. (1987 Plan at v.)

In cooperation with the National Park Service and the United States Department of Agriculture Forest Service, the Fish and Wildlife Service ("FWS") began preparing an Environmental Impact Statement ("EIS") in April of 1992. The EIS proceeded through three stages: (1) scoping (to identify issues and alternatives); (2) the draft EIS; and (3) the final EIS (FEIS). After receiving extensive oral and written comments on the draft EIS, the FEIS was issued in May of 1994.[5] The FEIS analyzes the environmental effects of five wolf recovery alternatives.[6] Ultimately, the FWS proposed to establish two nonessential experimental population areas (central Idaho and Yellowstone areas) under section 10(j) of the ESA ("Proposed Action Alternative"). (FEIS at xii). The FWS recommended that 15 wolves would be reintroduced annually to both Yellowstone National Park and central Idaho beginning in 1994.

On June 15, 1994, Defendant Bruce Babbitt, Secretary of the Interior, signed a Record of Decision and Statement of Findings on the Environmental Impact Statement for the Reintroduction of Gray Wolves to Yellowstone National Park and Central Idaho ("ROD") essentially adopting the Proposed Action Alternative. However, the decision to implement the Proposed Action Alternative was subject to certain conditions intended to "minimize or avoid the environmental impacts and public concerns identified during the environmental review process," including the preparation of nonessential experimental population rules under section 10(j) of the ESA to implement a wolf management program. (ROD at 6–7.) The preparation of such rules was subject to all regulatory requirements. The FWS published proposed rules for the designation of nonessential experimental populations of gray wolves to be introduced into the Yellowstone and central Idaho areas.[7] Comments regarding the proposed rules were to be submitted by October 17, 1994. The final rules were published on November 22, 1994. The Plan and rules involve the release of 90–150 wolves from Canada into the Yellowstone and central Idaho areas over a three to five year period. 59 Fed.Reg. 60252 (1994) ("Final Rules").

### PARTIES

*I. United States of America*

Defendants in these consolidated actions are the United States of America and the

---

completed, the Fish and Wildlife Service still considered the Northern Rocky Mountain Wolf a distinct subspecies of the wolf despite the trend among taxonomists to recognize fewer subspecies of wolves. (1980 Plan at 1.)

5. After issuance of the Draft Environmental Impact Statement, over 160,000 oral and written comments were received. Sixteen formal hearings were conducted, four each in Idaho, Montana, Wyoming and one each in Salt Lake City, Utah; Seattle, Washington; Denver, Colorado; and Washington, D.C. (*See* FEIS at 1–10.)

6. These five alternatives were: (1) reintroduction of experimental populations; (2) natural recovery (no action or current management strategy);

(3) no wolf; (4) wolf management committee; and (5) reintroduction of nonexperimental wolves. (FEIS at xii.)

7. The Yellowstone experimental population area is defined as "that portion of Idaho that is east of Interstate Highway 15; that portion of Montana that is east of Interstate Highway 15 and south of the Missouri River from Great Falls, Montana, to the eastern Montana border; and all of Wyoming." 50 C.F.R. § 17.84(i)(7)(ii). The central Idaho experimental population area is defined as "those portions of Idaho that are south of Interstate Highway 90 and west of Interstate 15, and those portions of Montana south of Interstate 90, Highway 93 and 12 from Missoula, Montana west of Interstate 15." 50 C.F.R. § 17.84(i)(7)(i).

agencies and officials of the U.S. Government which have cooperated in implementing the reintroduction of gray wolves to Yellowstone National Park and central Idaho. Included among the Defendants, are the Department of Interior, the United States Fish and Wildlife Service, the National Park Service, the Department of Agriculture and the United States Forest Service.

## II. Farm Bureaus

Plaintiffs in Civil Action 94–CV–286 include the Wyoming, Montana, and Idaho Farm Bureau Federations (hereinafter collectively referred to as "Farm Bureaus" or "Farm Bureau Plaintiffs") which are all voluntary, not-for-profit, organizations incorporated under the laws of their respective States. (*See* Farm Bureaus' First Amended and Supplemented Complaint ¶¶ 4, 5, and 6.) These Farm Bureaus represent the educational, economic, and social interests of 48,-000 members, with each Bureau having members who reside, farm, and/or ranch within the Yellowstone and central Idaho experimental population areas. *Id.* It is undisputed that many of the Farm Bureaus' members own and/or use private, state, and federal lands within these experimental population areas [8] "to graze livestock, hunt, . . . fish, and for recreation and aesthetic activities." [9] *Id.* The American Farm Bureau Federation ("AFBF") is a general farm organization with its principal place of business in Park Ridge, Illinois. The AFBF represents and promotes the economic, social, and educational interests of farmers and ranchers across the United States. *Id.* ¶ 7. The Idaho, Wyo-

ming and Montana Farm Bureaus are all affiliated members of the AFBF. *Id.* It is undisputed that all of these organizations and their members were involved in the administrative proceedings relating to the reintroduction process.[10]

The Farm Bureau Plaintiffs' First Amended Complaint asserts eleven claims for relief, one of which they dismissed. Farm Bureau Plaintiffs contend that: (1) Defendants' introduction of "Canadian" wolves which are alleged to be neither threatened, nor endangered, violates the requirements of section 10(j) of the ESA; (2) Defendants failed to introduce the experimental population outside the current range of the species in violation of section 10(j); (3) Defendants' introduction of "Canadian" wolves into the experimental areas violates 50 C.F.R. § 17.81(a) because this area is outside the "Canadian" wolves' probable historic range; (4) Defendants have introduced an experimental population which is not "wholly separate geographically" from nonexperimental wolf populations in violation of section 10(j)(2) of the ESA; (5) Defendants failed to adequately analyze and/or consider the various impacts of introducing an experimental wolf population in violation of the National Environmental Policies Act ("NEPA"); (6) Defendants failed to consult with affected landowners in violation of 50 C.F.R. § 17.81(d); (7) Defendants' actions violated Plaintiffs' right to meaningfully comment on the proposed rules pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. § 553(c); (8) Defendants failed to find, "based upon the best scientific and commer-

**8.** At the hearing on the Farm Bureaus' Motion for Preliminary Injunction, this Court heard testimony from members and officers of the Wyoming and Montana Farm Bureaus which substantiated these assertions.

**9.** At the preliminary injunction hearing, Farm Bureau members and officers testified that they or their members grazed livestock within the experimental population areas. However, no testimony was ever offered to support that members used these areas for hunting, fishing, recreation, or for aesthetic purposes.

**10.** In addition to the Farm Bureaus, Mountain States Legal Foundation ("MSLF") is a named party. The First Amended Complaint asserts that MSLF is a non-profit, public interest, legal

foundation. (Compl.¶ 8.) It is alleged that many of the MSLF members live, own property, and/or work in the Yellowstone area. *Id.* In addition, it is asserted that MSLF members use the private, state, and federal lands within the Yellowstone area for livestock, grazing, hunting, fishing, recreation, and aesthetic purposes. Although the Defendants have not raised a standing issue concerning MSLF, the record reveals that no testimony, affidavits or declarations were ever presented to this Court to establish MSLF's standing. Accordingly, pursuant to *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992), this Court finds that MSLF has failed to establish its standing to pursue this action.

cial data available," that the introduction of experimental populations will further conserve the species in violation of 50 C.F.R. § 17.81(b); (9) Defendants' biological assessment failed to adequately analyze the adverse effects on endangered and threatened species in violation of section 7 of the ESA; and (10) Defendants failed: (a) to provide Plaintiffs with an opportunity to comment; (b) to consider the Plaintiffs' comments; and (c) to respond to the comments submitted by Plaintiffs.

### III. James R. and Cat D. Urbigkit

Plaintiffs in Civil Action 95–CV–027, James R. and Cat D. Urbigkit (hereinafter "Urbigkits"), are residents of Pinedale, Wyoming. (Urbigkits' Reply Brief, Exhibits 2 and 3.) Since 1988, the Urbigkits have been studying, reporting and making presentations on the naturally occurring and allegedly genetically distinct wolves [11] in the Yellowstone and Wyoming area. *Id.* The Urbigkits assert that, as a result of the release of Canadian wolves, their opportunities to study and search for naturally occurring "Wyoming" wolves have been destroyed. *Id.* The Urbigkits state that they have discontinued their search for indigenous wolves and on one specific occasion in September 1995, forewent a field search for these wolves. *Id.* Finally, the Urbigkits maintain that as a result of the release of "Canadian" wolves their recreational activities, in the form of their long-term study of "Wyoming's" native wolves, have been halted. *Id.*

■ The Urbigkits' Complaint [12] asserts six claims for relief: (1) Defendants have failed to protect and conserve the naturally occurring wolves in the experimental areas in violation of the ESA, 16 U.S.C. § 1536(a)(1); (2) Defendants violated NEPA by failing to adequately analyze and/or consider: (a) the impacts on naturally occurring wolf popula-

tions; (b) the importance of maintaining subspecies and/or distinct populations; (c) the impacts to subspecies, including hybridization; and (d) the need for further research on the naturally occurring wolf population; (3) Defendants' introduction of "Canadian" wolves into the central Idaho and Yellowstone areas is outside the "historic range" of the "Canadian" wolves and violates the requirements of the ESA; (4) Defendants have introduced "Canadian" wolves into areas within the "current range" of the naturally occurring gray wolves in violation of section 10(j); (5) Defendants' introduction of an experimental wolf population is not wholly separate geographically from wolves naturally existing in the experimental population areas; and (6) Defendants failed to adequately consider the impacts caused by the introduction of "Canadian" wolves upon the naturally occurring wolves, *canis lupus irremotus*, in violation of section 7 of the ESA.

### IV. National Audubon Society, Predator Project, Sinapu and Gray Wolf Committee[13]

Plaintiffs in Civil Action 95–CV–1015 are the National Audubon Society, Predator Project, Sinapu, and Gray Wolf Committee (hereinafter collectively referred to as "Audubon Plaintiffs"). Plaintiff National Audubon Society is a non-profit national organization dedicated to, among other things, the protection and conservation of the nation's wildlife. (*See* Complaint ¶ 7.) Predator Project is a conservation organization dedicated to the protection of native predators such as the gray wolf. *Id.* at ¶ 9. Sinapu is also a conservation organization with members who allegedly use and enjoy present and potential wolf habitat in Idaho. *Id.* ¶ 10. These Plaintiffs collectively assert that their members reside in and near the central Idaho experi-

---

11. *Canis lupus irremotus* (commonly referred to as the Northern Rocky Mountain Wolf), is alleged to be a distinct subspecies of the gray wolf and was specifically listed as an endangered species in 1973. The Urbigkits allege the Canadian wolves released are known as *Canis lupus occidentalis.* (*See* Urbigkits Opening Brief at 11; *see also* Admin.Rec. II.F.10; II.F .7).

12. In analyzing the Urbigkits' Complaint and pleadings this Court is mindful that a *pro se* litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers. *See Hall v. Bellmon,* 935 F.2d 1106, 1107–08 (10th Cir.1991).

13. Plaintiff Sierra Club withdrew from this action shortly before the hearing on Plaintiffs' appeal.

mental population area and that their members use and enjoy this area for recreational, scientific, inspirational, educational, and other purposes on a continuing and regular basis and plan to do so in the future. *Id.* ¶ 12. Finally, these Plaintiffs assert that their aesthetic, conservational, recreational, scientific, educational, and wildlife preservation interests will be adversely and irreparably injured by the introduction of an experimental population into central Idaho. Id. ¶ 14. In response to the Defendants' challenge to their standing, the Audubon Plaintiffs have submitted declarations from members of each of these organizations.

On behalf of Sinapu, Plaintiffs filed the declaration of Michael Robinson, the executive director and co-founder of Sinapu. (*See* Declaration of Michael Robinson attached to the Audubon Plaintiffs' Reply Memorandum). Mr. Robinson states that he participated, on behalf of Sinapu, in the EIS process by offering comments on the Draft Environmental Impact Statement because of the impact it may have on the wolf's reintroduction in Colorado. *Id.* ¶ 2. Mr. Robinson further states that he has backpacked and camped at various places within the central Idaho experimental population area and that he had specific plans to return to the area in the summer of 1996. *Id.* ¶ 3. Mr. Robinson claims that the presence of naturally occurring gray wolves in the central Idaho recovery area adds immeasurably to the enjoyment that he experiences while hunting and camping. *Id.* He also asserts that the benefits that he enjoys during his visits to the central Idaho experimental population area would suffer because of the lack of ESA protections available to naturally occurring wolves under the reintroduction plan. *Id.* ¶ 5.

The declaration of Mr. Brian Peck was filed in support of the National Audubon's standing to challenge Defendants' actions. (*See* Declaration of Brian Peck attached to Audubon Plaintiffs' Reply Memorandum). Mr. Peck states that he is a member of the National Audubon Society. From 1992–94 he served as Wolf Recovery Specialist, and from mid–1994 to December, 1995, he served as the Endangered Species Coordinator for the National Audubon Society. Mr. Peck states that in these capacities he gave "many slide shows and other public education programs concerning wolf ecology, biology, management, reintroduction, and the natural recovery of wolves in the northwest Montana and central Idaho [regions]." *Id.* ¶ 2. Mr. Peck also participated in the public review process of the wolf reintroduction plan. *Id.* ¶ 3. Mr. Peck states that he is a backpacker and camper who has hiked many times in central Idaho. *Id.* ¶¶ 6 and 7. He asserts that the presence of naturally occurring gray wolves adds significantly to his enjoyment of the area and concludes that his enjoyment of the area will be impaired due to the increased dangers faced by naturally occurring wolves under the reintroduction plan. *Id.* Finally, he states that he will continue to utilize the natural areas of central Idaho with even greater regularity of his recent move from Colorado to Montana. *Id.*

In support of Predator Project's standing, Plaintiffs have submitted the Declaration of Ms. Susan Doyle who lives in Ketchum, Idaho, and is the founding member of Predator Project. (*See* Declaration of Susan Doyle attached to Audubon Plaintiffs' Reply Memorandum). Ms. Doyle states that "[f]or many years, my family and I have frequented Idaho's wilderness areas and national forests within the central Idaho nonessential experimental population area...." *Id.* ¶ 2. Ms. Doyle explains that several times each year she and her family backpack, camp, and/or cross-country ski in recreational areas within the central Idaho experimental population area and states, "As I have done many times in the past, I plan to continue to hike, backpack, ski, and vacation in the Idaho Population Area in the future." *Id.* In addition, every year her family spends Thanksgiving cross-country skiing in the Sawtooth National Recreation Area. *Id.* Ms. Doyle further states that in the summer of 1993, she, her husband, and daughter encountered two wild gray wolves at Thatcher Creek, which is fifteen miles from Stanley, Idaho. *Id.* ¶¶ 4 and 5. As a result of this experience Ms. Doyle states that she and her family have repeatedly returned to Thatcher Creek in the hopes of seeing additional wolves. *Id.* She asserts that the presence of naturally occur-

ring gray wolves in central Idaho adds to her enjoyment of the area. *Id.* As a result, she states that the adverse effects of the Idaho wolf reintroduction plans upon indigenous wolves would impair that enjoyment. *Id.*

The Audubon Plaintiffs have asserted two [14] causes of action against the federal Defendants which only attack the central Idaho reintroduction plan. The first contends that the Defendants' adoption of the central Idaho reintroduction plan and rules violates the ESA by withdrawing full ESA legal protection to wolves that have, and will migrate naturally into the central Idaho experimental population area. The Audubon Plaintiffs' second cause of action asserts that Defendants' central Idaho experimental population plan and rules treat the offspring of all wolves within the experimental area as members of the nonessential experimental population, regardless of whether they are the offspring of artificially introduced and naturally colonizing wolves, or of naturally occurring wolves alone, in violation of the ESA; 16 U.S.C. § 1539(j)(1).

## STANDING AND NOTICE

Defendants have challenged the Audubon Plaintiffs' and the Urbigkits' standing to bring any of their claims on the basis that the injuries they allege go to impacts upon animals (naturally occurring wolves) whose existence is in question. Defendants further assert that the injuries these Plaintiffs allege are purely psychological and fall short of the concrete harm that is necessary to establish standing. (Defs.' Response Brief at 5.) Defendants also attack the Farm Bureaus' standing to assert claims that Defendants have violated the ESA in failing to protect listed species, including the wolf. In addition, Defendants assert that the Farm Bureaus lack standing to assert their NEPA claims because the Farm Bureaus' injuries do not fall within NEPA's zone of interest. Finally, Defendants assert that the Farm Bureaus failed to provide adequate notice pursuant to 16 U.S.C. § 1540(g) as to counts

one and two of their complaint.[15] After carefully reviewing the case law on these issues, the Court finds that both the Audubon Plaintiffs and the Urbigkits have standing to bring their claims. While finding that the Farm Bureaus have standing to bring the majority of their claims, the Court finds that they lack standing to bring their NEPA-related claim.

The United States Supreme Court most recently summarized the standing requirements in *Bennett v. Spear*, —— U.S. ——, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997); and *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In *Lujan*, plaintiffs, several environmental organizations dedicated to wildlife conservation and other environmental causes, sought to challenge the Secretary of the Interior's (hereinafter "Secretary") reinterpretation of section 7(a)(2) of the ESA, 16 U.S.C. § 1536. In analyzing plaintiffs' standing, the Supreme Court summarized its recent holdings and outlined the three essential elements necessary to establish standing:

[o]ver the years, our cases have established that the irreducible constitutional minimum of standing contains three elements: First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally-protected interest which is (a) concrete and particularized, (citations omitted) and (b) "actual or imminent, not 'conjectural' or 'hypothetical,'" (citations omitted). Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." (Citations omitted). Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." (Citations omitted).

*Id.* at 560, 112 S.Ct. at 2136. Noting that the party invoking federal jurisdiction bears the burden of establishing these elements and of coming forward with evidence of specific

---

14. The Audubon Plaintiffs' Complaint actually asserts three causes of action. However, subsequent to oral argument, the third cause of action was withdrawn.

15. Defendants originally challenged the adequacy of the notice provided by the Urbigkits. However, at oral argument this challenge was withdrawn. (*See* Tr. at 157, February 8, 1995).

facts which prove standing, the Supreme Court concluded that plaintiffs had failed to establish an "injury in fact," as well as redressability. *Id.* at 561, 567–68, 112 S.Ct. at 2136–37, 2140–41.

Focusing on "injury in fact," the Court acknowledged, based upon its holding in *Sierra Club v. Morton,* 405 U.S. 727, 734, 92 S.Ct. 1361, 1365–66, 31 L.Ed.2d 636 (1972), that "the desire to use or observe an animal species, even for purely aesthetic purposes, is undeniably a cognizable interest for purposes of standing." *Lujan,* 504 U.S. at 562–63, 112 S.Ct. at 2137–38. In addition, however, to satisfy the injury in fact test, "the party seeking review must be himself among the injured." *Id.* Based upon the plaintiffs' affidavits, the *Lujan* Court observed that the plaintiffs had failed to show that damage to a species would produce imminent injury. Though the affiants had expressed an intent to return to areas where threatened species would potentially be impacted by the Secretary's reinterpretation of section 7(a), the court found that:

> the affiants' profession of an "inten[t]" to return to the places they had visited before—where they will presumably, this time, be deprived of the opportunity to observe animals of the endangered species—is simply not enough. Such "some day" intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the "actual or imminent" injury that our cases require.

*Id.* at 564, 112 S.Ct. at 2138. (emphasis added). Because plaintiffs' affidavits failed to establish more than a "some day" intent to return the areas affected, the Supreme Court found that the Plaintiffs failed to establish any injury in fact.

In *Bennett* the Court further clarified standing in the context of the ESA. It did so in two important respects. First, the Court adopted an expansive view of who was entitled to sue under the citizen suit provision of the ESA, 16 U.S.C. § 1540(g). *Bennett,* —— U.S. at ——, 117 S.Ct. at 1162. The Court noted that this view followed naturally from the expansive wording of the statute. *Id.* In particular, the Court cited to "[t]he first op-

erative portion of the provision [which] says that 'any person may commence a civil suit,'" language the Court characterized as "an authorization of remarkable breadth." *Id.* (citing 16 U.S.C. § 1540(g)). While recognizing the ESA's permissive language regarding *who* could bring a suit, the Court also acknowledged that the ESA only provided for limited *types* of suits which could be brought. The Court stated that, although the ESA "covers all private violations of the Act," it does not cover "all failures of the Secretary to meet his administrative responsibilities." *Id.* at ——, 117 S.Ct. at 1163. Consequently, those aggrieved by the actions of the Secretary of the Interior or another officer in implementing the ESA cannot avail themselves of the otherwise permissive language of the ESA's citizen suit provision.

The second important clarification regarding standing in *Bennett* was the Court's discussion of the zone-of-interest test as applied to the ESA. The Court has long held that in order to bring a claim pursuant to the Administrative Procedure Act "the plaintiff must establish that the injury he complains of . . . falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Id.* at ——, 117 S.Ct. at 1167 (citing *Lujan v. National Wildlife Federation,* 497 U.S. 871, 886, 110 S.Ct. 3177, 3187–88, 111 L.Ed.2d 695 (1990)). In *Bennett* the Court held that the interest to be protected must be determined by looking to the substantive provisions of the ESA. *Id.* More specifically, the Court found that the protected interest "within the meaning of the zone-of-interests test is to be determined not by reference to the overall purpose of the Act in question (here, species preservation), but by reference to the particular provision of law upon which the plaintiff relies." *Bennett,* —— U.S. at ——, 117 S.Ct. at 1167. The Court went on to conclude that the requirement, found in section 7 of the ESA, that each agency "use the best scientific and commercial data available," is "intended, at least in part, to prevent uneconomic (because erroneous) jeopardy determinations." *Id.* at ——, 117 S.Ct. at 1168. In other words, the requirements of section 7 of the of ESA protect not only the interests of those affect-

ed by species preservation, it also protects the economic interests of those who might be harmed by errant conservation measures.

It is behind this backdrop, as painted by *Lujan* and *Bennett,* that this Court must analyze Plaintiffs' standing.

## I. Standby of Audubon Plaintiffs and Urbigkits

■ Defendants assert that neither the Audubon Plaintiffs [16] nor the Urbigkits "have plead a cognizable injury resulting from the defendants' actions in this case...." (*See* Defendants. Response Brief at 7.) Furthermore, Defendants assert that the Audubon Plaintiffs' and Urbigkits' only demonstrated injuries are psychological injuries, and they have failed to adduce evidence or allege facts supporting a concrete or palpable injury resulting from Defendants' actions. *Id.* at 8. In making these arguments, Defendants primarily rely upon *Lujan, supra,* and *Humane Society of the United States v. Babbitt,* 46 F.3d 93 (D.C.Cir.1995). The Court agrees that mere psychological injuries are insufficient to establish standing. *See Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 485, 102 S.Ct. 752, 765, 70 L.Ed.2d 700 (1982). However, the Court disagrees that this is the only injury of which these Plaintiffs complain.

The Audubon Plaintiffs assert two injuries as a result of Defendants' actions: (1) as a result of Defendants' withdrawal of full ESA protections of natural wolves within the experimental areas, these Plaintiffs' members will be less likely to see or hear natural wolves because those wolves will be subjected to increased habitat loss and mortality that would otherwise be prevented or ameliorated by ESA protections; and (2) Defendants' withdrawal of ESA protections from Idaho's natural wolves will jeopardize the recovery of the gray wolf. (*See* Affidavits of Doyle, Peck, and Robinson summarized *supra.*) The Urbigkits essentially assert that

their ability to study naturally occurring "Wyoming" wolves has been destroyed by Defendants' actions. In addition, the Urbigkits assert that the release of "Canadian" wolves threatens the existence of the naturally existing wolves. (*See* Urbigkits' Response Brief at 4–5; and Affidavits summarized *supra.*)

■ As the *Lujan* noted, "the desire to use or observe an animal species, even for purely aesthetic purposes, is undeniably a cognizable interest for purposes of standing." *Id.* 504 U.S. at 562–63, 112 S.Ct. at 2137–38 (citing with approval *Sierra Club v. Morton,* 405 U.S. 727, 734, 92 S.Ct. 1361, 1365–66, 31 L.Ed.2d 636 (1972)). However, to satisfy the "injury in fact" test Plaintiffs must demonstrate that they, or their members, are among the injured; i.e., that one or more of Plaintiffs or their members would be directly affected apart from their special interest in the subject. *Lujan,* 504 U.S. at 563, 112 S.Ct. at 2138–39. In *Lujan,* the Court rejected plaintiffs' "animal nexus" and "vocational nexus" approaches, but pertinent to the issues raised here observed:

It is clear that the person who *observes* or *works* with a *particular* animal threatened by a federal decision is facing perceptible harm, since the very subject of his interest will no longer exist. It is even plausible— though it goes to the outermost limit of plausibility—to think that a person who observes or works with animals of a *particular species* in the very area of the world where that species is threatened by a federal decision is facing such harm, *since some animals that might have been the subject of his interest will no longer exist, see Japan Whaling Assn. v. American Cetacean Soc.,* 478 U.S. 221, 231, n. 4, 106 S.Ct. 2860, 2866, n. 4, 92 L.Ed.2d 166 (1986).

*Id.* 504 U.S. at 566–67, 112 S.Ct. at 2139–40 (emphasis added). In making this statement, the *Lujan* Court sought to clarify that a plaintiff's mere affinity (aesthetic interests

---

**16.** Defendants also attacked the Audubon Plaintiffs' standing on the basis that no affidavits had been submitted to establish standing at this stage of the proceedings, relying upon *Lujan,* 504 U.S. at 561, 112 S.Ct. at 2136–37. Subsequent to the

filing of Defendants' Response Brief, the Audubon Plaintiffs submitted the affidavits of Michael Robinson, Brian Peck, and Susan Doyle, which the Court previously summarized.

such as observation and study) for an endangered species is insufficient to challenge federal action taken anywhere that might have a detrimental impact on a portion of that species. *Id.* at n. 3. In addition to affinity, a plaintiff must establish proximity; i.e., the plaintiff must establish that the federal action threatens an impending injury upon that portion of species plaintiff observes. *Id.* The Court finds that the affidavits of both the Audubon Plaintiffs and the Urbigkits establish the "injury in fact" necessary for standing. Furthermore, these Plaintiffs are directly affected by the Defendants' actions.[17]

Consistent with the teaching of *Lujan,* the Court of Appeals for the District of Columbia in *Humane Society of the United States v. Babbitt,* 46 F.3d 93 (D.C.Cir.1995), stated:

> It is true that aesthetic interests such as the observation and study of endangered animals may in some circumstances state cognizable grounds to support Article III standing. *Sierra Club v. Morton,* 405 U.S. at 734, 92 S.Ct. at 1365–66; *Defenders of Wildlife,* 504 U.S. at 562–63, 112 S.Ct. at 2137–38. But in these cases, the plaintiff asserted injury because the challenged conduct threatened to diminish or deplete the overall supply of endangered animals available for observation and study. (Citations omitted).

*Id.* at 97. Here, the Audubon Plaintiffs, as well as the Urbigkits, have alleged that Defendants' conduct threatens to diminish some of the endangered animals available for study and not merely that the injury is psychological. Therefore, the Court finds that the Audubon Plaintiffs and Urbigkits have standing to challenge Defendants' actions.

## II. Farm Bureaus' Standing

Defendants have challenged Farm Bureaus' standing to pursue counts five, eight, and nine as set forth *supra,* in their First Amended Complaint. With respect to claims eight and nine, Defendants assert that the Farm Bureaus have failed to demonstrate any injury to their interest as a result of Defendants' alleged conduct. Under the Farm Bureaus' fifth claim (alleging violations of NEPA), Defendants contend that the economic interests Farm Bureau seeks to protect do not fall within NEPA's zone of interests. In response to the Defendants' argument, the Farm Bureaus assert that under *Lujan v. Defenders of Wildlife, supra,* they are accorded special procedural rights which provide them with standing to challenge Defendants' actions under the ESA and NEPA.

■ In *Lujan v. Defenders of Wildlife,* the Court addressed the ability of a party to establish standing based upon the denial or violation of a "procedural injury" or "procedural right." *Id.* at 571, 112 S.Ct. at 2142 In order to have standing to enforce the procedural protections allowed by a statute the plaintiff must establish that "the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Lujan,* 504 U.S. at 573 n. 8, 112 S.Ct. at 2143 n. 8. In addition, the plaintiff must show that the interest implicated is one which is within the zone of interests protected by the statute. *See Bennett,* —— U.S. at ——, 117 S.Ct. at 1167; *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 474–75, 102 S.Ct. 752, 759–60, 70 L.Ed.2d 700 (1982). While the Farm Bureau Plaintiffs meet these requirements as to their eighth and ninth claims, which they base on the ESA, they do not have standing to pursue their fifth claim which involves procedural protections based upon the National Environmental Policy Act (NEPA).

---

**17.** Unlike the affidavits involved in *Lujan v. Defenders of Wildlife,* and even *Humane Society of the United States v. Babbitt,* in this case the Audubon Plaintiffs and Urbigkits have stated their plans to use the experimental areas in the future. *See* Robinson Affidavit, *supra* ("This summer, I will return to central Idaho in hopes of seeing and/or hearing natural; that is, non-reintroduced wolves."); Peck Affidavit, *supra* ("I have traveled and hiked in central Idaho several times and will do so increasingly in the future as a result of my recent move to Montana from Colorado."); Doyle Affidavit, *supra* ("Every year, my family and I spend Thanksgiving cross-country skiing in the Sawtooth National Recreation Area. As I have done many times in the past, I plan to continue to hike, backpack, ski, and vacation in the Idaho Population Area in the future."); *see also* Cat Urbigkit Affidavit ¶ 9; Jim Urbigkit Affidavit ¶¶ 6 and 7.

■ In their fifth claim for relief the Farm Bureau Plaintiffs claim that Defendants failed to properly prepare the FEIS in violation of NEPA. (*See* Farm Bureau Plaintiffs' First Amended Complaint, ¶ 101.) It is well established that the purpose of NEPA is to protect the environment and not "economic interests." *See Nevada Land Action Association v. United States Forest Service*, 8 F.3d 713, 716 (9th Cir.1993) and cases cited therein; *see also Region 8 Forest Service Timber Purchasers Council v. Alcock*, 993 F.2d 800, 808 (11th Cir.1993), *cert. denied*, 510 U.S. 1040, 114 S.Ct. 683, 126 L.Ed.2d 651 (1994). The Farm Bureaus' only claimed interests are limited to economic interests and human safety concerns. The Farm Bureaus' economic interests do not fall within the "zone of interests to be protected or regulated" under NEPA and as a result they may not avail themselves of the procedural protections afforded by that provision. In addition, the Court agrees with the Defendants that Farm Bureaus' human safety concerns, in addition to being generalized, are too speculative to establish standing under NEPA. *See Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 773–77, 103 S.Ct. 1556, 1560–63, 75 L.Ed.2d 534 (1983); *Competitive Enterprise Institute v. National Highway Traffic Safety Administration*, 901 F.2d 107, 111, (D.C.Cir.1990). Accordingly, this Court finds that the Farm Bureaus lack standing to pursue their fifth claim.[18]

■ Farm Bureaus' eighth and ninth claims differ in that they are rooted in the protections found in the ESA. The Supreme Court's holding in *Bennett* establishes that the Farm Bureau Plaintiffs do have standing for these claims. The Farm Bureaus' eighth claim for relief asserts that the "Defendants' finding that the reintroduction of Canadian wolves into the Yellowstone and central Idaho areas will conserve the species is not based upon the 'best scientific and commer-

cial data available,'" in violation of the ESA and 50 C.F.R. § 17.81(b). (*See* Farm Bureau Plaintiffs' First Amended Complaint, ¶¶ 123–131.) Their ninth claim similarly challenged the Defendants' determination that reintroduction efforts would not impact the continued existence of other endangered or threatened species. *Id.* ¶¶ 134–142. While *Bennett* tells us that the Farm Bureaus do not have standing to raise these two claims pursuant to the ESA's citizen suit provision, they do have standing to challenge these alleged procedural failures under the APA. The Farm Bureaus' economic interests are concrete enough to satisfy *Lujan*, but *Bennett* also tells us that these interest fall within the zone of interests implicated by the ESA. The Court in *Bennett* stated:

> The obvious purpose of the requirement that each agency "use the best scientific and commercial data available" is to ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise ... we think it readily apparent that another objective (if not indeed the primary one) is to avoid needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives.

*Bennett*, —— U.S. at ——, 117 S.Ct. at 1168. Those are the exact interests implicated in this case. Consequently, the Farm Bureau Plaintiffs have standing to pursue claims eight and nine of their First Amended Complaint.

### III. *16 U.S.C. 1540(g) Notice Requirement*

■ Defendants assert that this Court should dismiss counts one and two of the Farm Bureaus' complaint on the basis that they failed to comply with the statutory notice requirements under 16 U.S.C. § 1540(g) of the ESA. Defendants acknowledge that the Farm Bureaus timely submitted their written notice, but assert that the notice failed to specifically identify those claims be-

---

**18.** This finding is also applicable to the Farm Bureaus' claims that Defendants violated NEPA by failing to consider the impact of wolf/dog hybridization, the impacts on naturally occurring wolves, and the impact on the Selkirk Caribou. (*See* Farm Bureaus' First Amended complaint, ¶¶ 97–102.)

ing raised in counts one and two. The Farm Bureau Plaintiffs assert that under 16 U.S.C. § 1540(g), a plaintiff is not required to specifically identify each and every act that constitutes a violation of the ESA. Nevertheless, Plaintiffs contend that even if such specificity were required, their notice was sufficient. The Court agrees.

The applicable portion of 16 U.S.C. § 1540(g) requires:

No action may be commenced under [the citizen suit provision of the ESA]—

(I) prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation.

*Id.* Based upon *Hallstrom v. Tillamook County,* 493 U.S. 20, 26, 110 S.Ct. 304, 308–09, 107 L.Ed.2d 237 (1989), it is clear that compliance with this 60–day notice provision is a mandatory condition precedent for suit. However, the sole focus in *Hallstrom* was whether a district court, at its discretion, could disregard the notice requirements. In holding that it could not, the Supreme Court in *Hallstrom* did not address the sufficiency or the degree of specificity the notice must contain. The plain language of the statute also gives little guidance as to how specific the "notice of the violation" must be. The only persuasive authority on point, based upon an analysis of the purposes behind the notice provision, requires that the notice: (1) identify the specific ESA sections alleged to

have been violated; (2) provide a *generic* description of the activity alleged to constitute the violation; and (3) be provided to the Secretary and to the alleged violator. *See Brewer v. Ravan,* 680 F.Supp. 1176, 1180 (M.D.Tenn.1988).[19] Based upon a review of the Farm Bureaus' Notice of Intent to Sue,[20] the Court finds that it identifies the ESA section alleged to have been violated and gives a generic description of the activity alleged to constitute the violation. Accordingly, it meets the minimum requirements under 16 U.S.C. § 1540(g). Defendants arguments to the contrary are rejected.

Having resolved the preliminary issues concerning standing and notice, the Court must now focus on the merits of the parties' claims.

## STANDARD OF REVIEW

Judicial review of agency action is governed by § 706 of the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701–706. The Plaintiffs in these consolidated cases implicate the subsections of § 706 which require a reviewing court to hold unlawful and set aside agency action, findings, and conclusions found to be: arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or without observance of procedure required by law.[21] "These standards require the reviewing court to engage

---

**19.** In *Brewer, supra,* the district court was interpreting the notice provisions under RCRA. However, it is generally recognized that the construction of the notice provisions of the ESA are governed by the interpretation of RCRA provisions. *See Save the Yaak Committee v. Block,* 840 F.2d 714, 721 (9th Cir.1988).

**20.** *See* Farm Bureaus Reply Brief, Exhibit 1.

**21.** 5 U.S.C. § 706 provides:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those

in a 'substantial inquiry.' ... An agency's decision is entitled to a presumption of regularity, 'but that presumption is not to shield [the agency's] action from a thorough, probing, in-depth review.'" *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir.1994) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)).

The Tenth Circuit has held "the essential function of judicial review is a determination of (1) whether the agency acted within the scope of its authority, (2) whether the agency complied with prescribed procedures, and (3) whether the action is otherwise arbitrary, capricious or an abuse of discretion." *Olenhouse*, 42 F.3d at 1574.

> Determination of whether the agency acted within the scope of its authority requires a delineation of the scope of the agency's authority and discretion, and consideration of whether on the facts, the agency's action can reasonably be said to be within that range. *Overton Park*, 401 U.S. at 415–16, 91 S.Ct. at 823–24. Determination of whether the agency complied with prescribed procedures requires a plenary review of the record and consideration of applicable law. *See id.* at 416–17, 91 S.Ct. at 824.

*Olenhouse*, 42 F.3d at 1574. Noting that the legal principles applicable to the first two determinations are straightforward, the *Olenhouse* court went on to describe the difficulty in connection with judicial review under the "arbitrary and capricious" standard:

> The duty of a court reviewing agency action under the "arbitrary or capricious" standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). In reviewing the agency's explanation, the reviewing court must determine whether the agency considered all relevant factors

and whether there has been a clear error of judgment. *Id.* (citing *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823); *see Sabin v. Butz*, 515 F.2d at 1069 (citing *Overton Park*). Agency action will be set aside

> "if the agency relied on factors which Congress has not intended for it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Motor Vehicle Mfrs.*, 463 U.S. at 43, 103 S.Ct. at 2867.

***

Because the arbitrary and capricious standard focuses on the rationality of an agency's decision making process rather than on the rationality of the actual decision, "[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs.*, 463 U.S. at 50, 103 S.Ct. at 2870. Thus, the grounds upon which the agency acted must be clearly disclosed in, and sustained by, the record. *American Petroleum*, 540 F.2d at 1029 (construing *Motor Vehicle Mfrs.*). The agency must make plain its course of inquiry, its analysis and its reasoning. *Id.* After-the-fact rationalization by counsel in briefs or argument will not cure noncompliance by the agency with these principles. *Id.* If the agency has failed to provide a reasoned explanation for its action, or if limitations in the administrative record make it impossible to conclude the action was the product of reasoned decision making, the reviewing court may supplement the record or remand the case to the agency for further proceedings. *Motor Vehicle Mfrs.*, 463 U.S. at 34, 50–57, 103 S.Ct. at 2862, 2870–74; *Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *see Thomas Brooks*, 920 F.2d at 643–44. It may not simply affirm.

parts of it cited by a party, and due account shall

be taken of the rule of prejudicial error.

*Olenhouse,* 42 F.3d at 1575. Nevertheless, a court's review of an agency decision under this standard is "narrow and deferential," the court being required to uphold the agency's action if it has "articulated a rational basis for the decision and has considered relevant factors." *Mountain Side Mobile Estates Partnership v. Secretary of Housing and Urban Dev.,* 56 F.3d 1243, 1250 (10th Cir. 1995). "However, these limitations do not apply to questions of law. 'The [f]ailure to apply the correct legal standard or to provide ... a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal.'" *Id.* (quoting *Nielson v. Sullivan,* 992 F.2d 1118, 1119–20 (10th Cir.1993)).

## DISCUSSION

I. *Farm Bureau Plaintiffs' Procedural Rights*

 The Farm Bureau Plaintiffs contend that Defendants promulgated and implemented the reintroduction plan in violation of certain procedural rights granted to them by 50 C.F.R. § 17.81(d).[22] Specifically, the Farm Bureaus allege that the Defendants never "consulted" with "affected private landowners" in either the development or implementation of the Final Rules, nor did Defendants reach, or attempt to reach, an "agreement" with "persons holding any interest in land which may be affected by the establishment of an experimental population" prior to the development and implementation of the experimental population rules. (*See* Farm Bureaus' First Amended and Supplemented Compl., Sixth and Seventh Claims for Relief.) Rather, these Plaintiffs allege that Defendants ignored the concerns of Plaintiffs and their members and failed to take those concerns into account in the final rules.

The Farm Bureau Plaintiffs argue that the provisions in § 17.81(d) require more than merely soliciting comments from the general public. They argue that § 17.81 grants their members, who own and/or hold interests in land within the Yellowstone and central Idaho areas, certain procedural rights beyond those granted to the general public. In support of this argument, the Farm Bureaus cite to a portion of Congressional legislative history indicating Congress' intent that "where experimental populations are released on, or near, private land, the landowners must be fully apprised of the release and the regulations under which the population will be managed." H.Rep. No. 97–567, 97th Cong., 2d Sess. § 5 (Merchant Marine and Fisheries Committee)(1982) U.S. Code Cong. & Admin.News 1982 pp. 2807, 2831–2835. The Committee further stated, "Regulations should be viewed as an agreement among the federal agencies, the state fish and wildlife agencies and any landowners involved. Changes in the regulations should only be made after close consultation with all of the affected parties." *Id.*

Contrary to the Farm Bureaus' contentions, however, the record supports a finding that the FWS did "consult" with affected private landowners, as well as many other interested members of the public, in developing and implementing the experimental population rules. In fact, the record contains substantial evidence of such consultation ranging from public hearings, to specific meetings with private groups such as the Farm Bureau and Montana Stockgrowers, to exchanging written correspondence. (*See, e.g.,* Admin.Rec. II.A.3 (FEIS) at 5–1 to 5–153.) Further, neither the language of the regulations nor the legislative history behind the enactment of § 10(j) supports a finding that FWS is required to obtain approval and "agreement" from persons holding any inter-

---

22. "The Fish and Wildlife Service shall consult with appropriate State fish and wildlife agencies, local governmental entities, affected Federal agencies, *and affected private landowners in developing and implementing experimental population rules.* When appropriate, a public meeting will be conducted with interested members of the public. *Any regulation promulgated pursuant to this section shall, to the maximum extent practicable, represent an agreement between the Fish and Wildlife Service, the affected State and Federal agencies and persons holding any interest in land which may be affected by the establishment of an experimental population."* 50 C.F.R. § 17.81(d) (emphasis added).

est in land which may be affected by the establishment of an experimental population before enacting experimental population rules. To the contrary, these documents indicate the FWS' and Congress' intent that such rules and regulations, *to the maximum extent practicable,* serve as a type of cooperative agreement between the affected parties. 50 C.F.R. § 17.81(d); H.Rep. No. 97–567, 97th Cong., 2d Sess. § 5; *see also* H.Rep. No. 97–567, 97th Cong., 2d Sess. (1982), Departmental Report of G. Ray Arnett, § 5, U.S. Code Cong. & Admin.News 1982 pp. 2807, 2845–46. It certainly would not be practicable to require the FWS to reach a complete agreement between itself, the affected State, Federal agencies, and all affected private landowners.

■ The Farm Bureaus further contend that Defendants failed to consider their comments before going forward with the reintroduction plans. Plaintiffs assert that, prior to the publication of the proposed rule, Defendants had already solicited bids and requisitioned parts for the wolf holding pens and had begun negotiations with Canadian officials for the capture and transportation of "Canadian" wolves to the United States. Plaintiffs also assert that, after publication of the proposed rules but before the close of the comment period, Defendants had awarded the contract for, and accepted delivery of, the preconstructed chain link panels for the holding pens, and had requested a permit from the Government of British Columbia for the transportation of wolves to Yellowstone and central Idaho. (Farm Bureau Br. at 40–41.) The Farm Bureaus contend that such actions demonstrate Defendants' determination, prior to receiving and considering their comments, to introduce "Canadian" wolves into the subject areas. Thus, Plaintiffs argue, Defendants' failure to consider their comments before implementing the final rules rendered meaningless the notice and opportunity to comment provisions of the Administrative Procedures Act ("APA").[23]

However, the record reveals that many of the Farm Bureaus' comments and concerns were incorporated into the substance of the final rules. (Admin.Red. I.I. at 60258); *see, e.g.,* 50 C.F.R. § 17.84(i)(3)(i) (allowing harassment of wolves by private landowners and livestock producers using public land); § 17.84(i)(3)(ii) (allowing livestock producers on their private land to take a wolf in the acting of killing, wounding, or biting livestock); § 17.84(i)(3)(iii) (allowing issuance of permits for taking of wolves on public land); § 17.84(i)(3)(v) (authorizing removal of any wolf determined to present a threat to human life or safety); § 17.84(i)(3)(vi) (authorizing taking of a wolf in self defense or in defense of others); § 17.84(i)(3)(vii) (authorizing FWS' control of "problem" wolves). Additionally, the FEIS specifically addresses comments submitted by the American Farm Bureau Federation (FEIS at 5–126–30) and issues relating to wolf control strategies, the impacts of wolf recovery on domestic livestock, compensation for livestock depredations, and the impacts of wolf recovery on land use. (*See* FEIS at 1–11 – 1–17.) The Court finds that Defendants addressed and considered the Farm Bureau Plaintiffs' members comments and concerns in developing and implementing the experimental population rules.

## II. *National Environmental Policy Act ("NEPA")*

■ NEPA requires all agencies of the Federal Government to include in any proposal for "major Federal actions significantly affecting the quality of the environment" a detailed statement on: 1) the environmental impact of the proposed action; 2) any unavoidable adverse environmental effects should the proposal be implemented; 3) alternatives to the proposed action; and 4) any

**23.** "After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C.A. § 553(c).

irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. 42 U.S.C.A. § 4332(2)(C).[24] The Urbigkits contend that Defendants violated these provisions of NEPA by failing to address the impacts of their proposed action on: 1) naturally occurring wolves, 2) the maintenance of wolf subspecies; and 3) the need for more research on naturally occurring wolves. The FWS represented that these issues and impacts "were not evaluated further in the FEIS because they were *not significant* to the decision being made." (FEIS at 1–18) (emphasis added).[25] More specifically, the FWS stated that these issues and impacts were "not within the scope of the decision to be made in the FEIS or will not be significantly impacted by the alternatives." (FEIS 1–18.)

The NEPA requirement for the preparation of an EIS serves two important functions:

> It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision making process and the implementation of that decision.

*Holy Cross Wilderness Fund v. Madigan,* 960 F.2d 1515, 1521 (10th Cir.1992) (quoting *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 1845, 104 L.Ed.2d 351 (1989)). While NEPA re-

quires agencies to take a "hard look" at the environmental impacts of proposed actions, it "does not mandate particular results, but simply prescribes the necessary process." *Id.* 960 F.2d at 1521–22 (quoting *Robertson,* 490 U.S. at 350, 109 S.Ct. at 1846).

 "A court reviewing the adequacy of an EIS merely examines 'whether there is a reasonable, good faith, objective presentation of' the topics NEPA requires an EIS to cover." *Id.* 960 F.2d at 1522 (quoting *Johnston v. Davis,* 698 F.2d 1088, 1091 (10th Cir.1983)). "NEPA does not require agencies to analyze 'the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or ... impractical or ineffective.'" *All Indian Pueblo Council v. United States,* 975 F.2d 1437, 1444 (10th Cir.1992) (quoting *City of Aurora v. Hunt,* 749 F.2d 1457, 1467 (10th Cir.1984)). In reviewing a challenge to the adequacy of an EIS, then, this Court's job is not to "second-guess the experts" in policy matters, but rather to determine whether the "statement contains sufficient discussion of the relevant issues and opposing viewpoints to enable the decisionmaker to take a 'hard look' at environmental factors, and to make a reasoned decision.... Thus, [the Court] test[s] the discussion of alternatives in an EIS under a 'rule of reason' standard of review." *All Indian Pueblo Council,* 975 F.2d at 1445 (citations omitted).

The Urbikits argue that the Endangered Species Act (ESA), which was intended to provide a program for the conservation of endangered and threatened species,[26] re-

---

**24.** Section 4332(2)(C) also requires a detailed statement on the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity. However, this provision has not been implicated in this action.

**25.** The FWS identified fifteen issues and impacts of the wolf recovery plan that were not evaluated further in the FEIS because they were determined to not be significant to the decision being made: wolves not native to Yellowstone National Park; wolf rights; federal "subsidies"; human safety and health; other predators and scavengers; endangered species; plants, invertebrates, fish, reptiles, amphibians, birds, and mammals;

diseases and parasites; private property rights; wolf recovery in other areas; existing wolves in central Idaho and Yellowstone; existing wolves in Northwestern Montana; wolf subspecies; wolf and dog and coyote hybridization; and need for research. (FEIS at 1–18.)

**26.** "The purposes of [the Endangered Species Act] are to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conven-

quires the consideration of wolf subspecies. In particular, they argue that, because the ESA provides that the listing of a given taxon includes all lower taxonomic units, the ESA makes subspecies relevant to recovery efforts. (*See* 16 U.S.C.A. § 1532(16) (term "species" includes any subspecies of wildlife, and any distinct population segment of any species of wildlife)). The Urbigkits also rely on a letter from Dr. Ron M. Nowak,[27] commenting on the draft EIS with regard to taxonomic issues, wherein Dr. Nowak states, "[T]here is the misleading suggestion that the original Yellowstone wolf has affinity with the wolves that would be reintroduced, when in fact there is a pronounced subspecific distinction. It also is wrong to state that the 1978 listing made subspecies irrelevant.... A big part of the conservation of a full species is to insure that its component subspecies and populations remain intact and in place, and that over-all diversity and evolutionary potential are maintained." (Admin.Rec.II.F.10.) Thus, Urbigkits argue, the gray wolf subspecies indigenous to the Yellowstone area, *canis lupus irremotus*, which was listed as endangered in 1973, deserves full protection under the ESA. Urbigkits further argue that because the wolves from Canada are of a distinct subspecies from the indigenous wolves, Defendants' reintroduction plan will have an adverse impact on the conservation of the *irremotus* subspecies existing in the Yellowstone area, an impact which Urbigkits allege Defendants failed to adequately analyze. Finally, Urbigkits argue that Defendants failed to adequately address the need for more research on the naturally occurring wolves to determine the potential impacts of the reintroduction plan on them.

In response to such concerns, the FEIS explains the reasons why these issues/impacts were "not chosen for detailed analysis." (FEIS 1–18 to 1–23.) With respect to the alleged impacts on naturally occurring wolves in the Yellowstone area and on the mainte-

nance of wolf subspecies, the FWS reported that "[n]o evidence exists that wolf populations persisted in the northern Rocky Mountains of the U.S. [since their extirpation in the 1930's] to the present time or that the lone wild wolves occasionally reported in these areas are other than dispersing wolves from Canadian populations." (FEIS 1–21) (citing Brewster and Fritts 1992, Nowak 1993). The FWS further reported that recent taxonomic research indicates that little genetic difference exists among North American wolves and suggests that gray wolves throughout northern North America are all one subspecies of *Canis lupus*. (FEIS 1–21 – 1–22.)

Defendants assert that these issues were not considered in detail because the FWS had "reasonably determined, based on careful study and scientific evidence," that there were no existing wolf populations in the reintroduction area. (Defs.' Br. at 41) (citing FEIS at 6–84–94, 1–21–22, 5–83–84, 5–118–19, 5–126–27, 5–131–33). Defendants argue, then, that because such a determination is well-supported in the FEIS and the record, it is not arbitrary and capricious to conclusion that the alleged impacts on indigenous wolves and wolf subspecies are "not significant." Further, the FWS reported that, with respect to the issue of additional research, wolves have been intensively studied in North America, "and any wolf reintroduction would be evaluated and improved using modern scientific techniques.... In addition, a 3–phase interagency wolf monitoring program has already been implemented in Montana, Idaho, and Wyoming to document wolf activity and recovery." (FEIS at 1–23.) The FWS concluded that the issue of additional research "is not an impact of wolf recovery...." *Id.* (citing Wolf Studies Task Force 1987, Tucker 1988, and Ream et al.1991).

The record shows that the FWS investigated the alleged existence of naturally occur-

tions set forth in subsection (a) of this section." 16 U.S.C.A. § 1531(b).

**27.** Dr. Nowak is employed by the United States Fish and Wildlife Service's Office of Scientific Authority.

ring wolves in the subject areas and studied the taxonomy issues. After the conclusion of such research, the FWS exercised its discretion in choosing from admittedly conflicting opinions and results.[28] The fact that, in developing the wolf reintroduction plan, the FWS followed opinions and conclusions contrary to that held by the Urbigkits does not undermine the validity of the plan. The Court cannot say that the FWS' determination regarding the insignificance of the issues and alleged impacts raised by the Urbigkits (to the decision being made) was unsupported by evidence in the record or that the FWS made a clear error of judgment. Rather, the record reveals that the FWS "considered the relevant factors" and "articulated a rational connection between the facts found and the decision made." *Olenhouse,* 42 F.3d at 1574. The FWS' decision, then, to forego further analysis of these issues and their impacts was not arbitrary and capricious.[29]

The regulations governing implementation of an EIS state in part: "To achieve the purposes set forth in § 1502.1 agencies shall prepare environmental impact statements in the following manner: ... Impacts shall be discussed in proportion to their significance. *There shall be only brief discussion of other than significant issues.* As in a finding of no significant impact, there should be only enough discussion to show why more study is not warranted." 40 C.F.R. § 1502.2(b) (emphasis added). The Court finds that the FWS' discussion in the FEIS of the issues and impacts raised by the Urbigkits complied with the procedural requirements of NEPA.

## III. *Endangered Species Act § 10(j)*

Section 10(j) was added to the ESA in 1982 in an effort to grant flexibility in the treatment of populations of endangered or threatened species that are introduced into areas outside their current range. H.Rep. No. 97–567, 97th Cong., 2d Sess. § 5. Section 10(j) provides as follows:

(1) For purposes of this subsection, the term "experimental population" means any population (including any offspring arising solely therefrom) authorized by the Secretary for release under paragraph (2), *but only when and at such time as, the population is wholly separate geographically from nonexperimental populations of the same species.*

(2)(A) The Secretary may authorize the release (and the related transportation) of any population (including eggs, propagules, or individuals) of an endangered species or a threatened species outside the current range of such species if the Secretary determines that such release will further the conservation of such species.

(B) Before authorizing the release of any population under subparagraph (A), the Secretary shall by regulation identify the population and determine, on the basis of the best available information, whether or not such population is essential to the continued existence of an endangered species or a threatened species .[30]

(C) For the purposes of this chapter, each member of an experimental popula-

---

**28.** *See Laguna Greenbelt, Inc. v. U.S. Dept. of Transportation,* 42 F.3d 517, 530 (9th Cir.1994) (quoting *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 377, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989)) ("Because analysis of these factual issues requires a high level of technical expertise, 'we must defer to the informed discretion of the responsible federal agencies.' ").

**29.** The preceding analysis is also applicable to the Urbigkits' Sixth Claim for Relief under § 7 of the ESA which states in part: "Each federal agency shall ... insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species...." 16 U.S.C.A. § 1536(a)(2). As discussed

previously in this section, the Urbigkits contend that the reintroduction of Canadian wolves into the Yellowstone area will jeopardize the continued existence of the wolf subspecies indigenous to that area, *canis lupus irremotus.* However, this claim also fails given the Court's finding herein that the FWS' determination that any existing wolves in the Yellowstone area will not be significantly impacted by the plan was not arbitrary and capricious.

**30.** The wolves reintroduced into the Yellowstone and central Idaho areas were classified as "nonessential" experimental wolves in accordance with this section. 59 Fed.Reg. 60,252 (1994) (Final Rules).

tion shall be treated as a ·threatened species; except that—

(I) solely for purposes of section 1536 of this title (other than subsection (a)(1) thereof), an experimental population determined under subparagraph (B) to be not essential to the continued existence of a species shall be treated, except when it occurs in an area within the National Wildlife Refuge System or the National Park System, as a species proposed to be listed under section 1533 of this title; and

· (ii) critical habitat shall not be designated under this chapter for any experimental population determined under subparagraph (B) to be not essential to the continued existence of a species.

(3) The Secretary, with respect to populations of endangered species or threatened species that the Secretary authorized, before October 13, 1982, for release in geographical areas separate from the other populations of such species, shall determine by regulation which of such populations are an experimental population for the purposes of this subsection and whether or not each is essential to the continued existence of an endangered species or a threatened species. (emphasis added).

The Farm Bureaus and Urbigkits allege that Defendants have violated § 10(j)(2)(A) by introducing a population of an endangered species within that species' current range.[31] In making this allegation, both parties, relying on reported sightings of wolves in the Yellowstone and central Idaho areas, assert that the designated "experimental population areas" are within the current range of naturally occurring gray wolves. Additionally, the Farm Bureau Plaintiffs assert that the designated areas are within the current range of the naturally occurring Montana wolf populations. These Plaintiffs further

allege that Defendants cannot maintain an "experimental population" in the designated areas because the "experimental population" is not "wholly separate geographically from nonexperimental populations of the same species." In support of this argument, Plaintiffs once again rely upon the reported sightings of wolves in the Yellowstone and central Idaho areas. The Farm Bureaus further assert that the "experimental population" is not wholly separate geographically from the naturally occurring wolves in Montana because there is no geographic separation; i.e. natural or manmade barriers, that would prevent the naturally occurring wolves from overlapping with the "experimental population."

In response to such arguments, Defendants contend that the FWS' determination that the experimental population areas are outside the current range of the gray wolf is rationally based and supported in the record. Specifically, Defendants assert that such a determination was based on the conclusion that there were no known "populations," as defined by Defendants for purposes of the reintroduction plan, in either of the experimental population areas prior to the introduction. Defendants further assert that the "wholly separate geographic" requirement applies only to "populations" and not individual animals. Moreover, Defendants argue, to the extent any ambiguity exists in what constitutes a "population," Defendants are entitled to substantial deference to their interpretation.

Two questions are presented when a court reviews an agency's construction of a statute which it administers. *Chevron, U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). The court must first determine whether Congress has directly spoken to the precise question at

---

**31.** These allegations constitute count 2 of the Farm Bureaus' First Amended Complaint and

Count 4 of the Urbigkits' Complaint.

issue. If so, no further questions must be asked for both the court and agency must give effect to Congress' unambiguously expressed intent.[32] *Id.*

If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

"The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Morton v. Ruiz,* 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974). If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.

*Id.* 467 U.S. at 843–44, 104 S.Ct. at 2781–82 (footnotes omitted). Therefore, under *Chevron,* considerable deference is accorded to the agency's interpretation of the statute, and such an interpretation should not be disturbed "unless it appears from the statute *or its legislative history* that the accommodation is not one that Congress would have sanctioned." *Id.* at 845, 104 S.Ct. at 2783 (quoting *United States v. Shimer,* 367 U.S. 374, 383, 81 S.Ct. 1554, 1561, 6 L.Ed.2d 908 (1961)) (emphasis added); *see also Akindemowo v. U.S. I.N.S.,* 61 F.3d 282, 284–85 (4th Cir.1995).

■ The Defendants' arguments are focused upon the FWS' definition of "population" formulated for purposes of determining whether a nonexperimental population of wolves existed in the experimental population areas. (Defs.' Br. at 29.) The FWS' definition provides: "A wolf population is at least 2 breeding pairs of wild wolves successfully raising at least 2 young each (until December 31 of the year of their birth), for 2 consecutive years in an experimental area." (Admin.Rec. II.A.3 at 6–67.) In accordance with *Chevron,* the Court must first determine whether Congress has spoken to the precise question of what constitutes a "population" for purposes of § 10(j).

■ Defendants correctly point out that the term "population" is not defined anywhere in the ESA.[33] Neither does the legislative history provide guidance on this precise issue. Thus, the Court must determine whether the FWS' definition of "population" is based on a permissible construction of the statute. While careful review is always required, deference to an agency's judgment is especially appropriate where the challenged decision implicates special agency expertise. *National Cattlemen's Ass'n v. United Stated Environmental Protection Agency,* 773 F.2d 268, 271 (10th Cir.1985); *Mount Graham Red Squirrel v. Espy,* 986 F.2d 1568, 1571 (9th Cir.1993).

Applying this principle, the Court finds that the FWS' definition of "population" is based on a permissible construction of the ESA § 10(j) which seeks to secure the recovery of listed species. H.Rep. No. 97–567, 97th Cong., 2d Sess. § 5. Defendants assert that the FWS' definition is based on two core concepts of reproduction and sustainability which are soundly based in relevant scientific literature. Defendants also assert that such concepts are further supported by the opinions of numerous scientists with knowledge

---

**32.** The *Chevron* Court noted that "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." 467 U.S. at 843 n. 9, 104 S.Ct. at 2782 n. 9.

**33.** The Farm Bureau Plaintiffs incorrectly assert that Congress defined the term "population" in § 10(j). Instead, Congress defined what constitutes an "experimental population" under that section. *See* ESA § 10(j)(1).

and expertise specific to wolf biology.[34] (Defs.' Br. at 29 (citing Admin.Rec. II.A.3 at 6–66–75 (describing methods and literature used for arriving at definition); II.D.1–33 (survey results))). Defendants contend that the FWS' definition promotes the recovery objective of the ESA, and specifically § 10(j). Given Congress' expressed objective, the Court finds that the FWS' definition is not "arbitrary, capricious, or manifestly contrary to the statute." *See Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782. *See Greenpeace Action v. Franklin,* 982 F.2d 1342, 1355 (9th Cir.1992) ("When an agency relies on the analysis and opinion of experts and employs the best evidence available, the fact that the evidence is ... not dispositive, does not render the agency's determination 'arbitrary and capricious' ").

 While the Court must defer to the FWS' definition of "population," a more thorough analysis of the reintroduction plan's compliance with the requirements of § 10(j) is necessary. First, § 10(j)(1) only allows an "experimental population" to be maintained "when, and at such time as, the [experimental] population is *wholly separate geographically* from nonexperimental populations of the same species." (emphasis added.) In analyzing what Congress meant by the phrase "wholly separate geographically," it is helpful to review the legislative history to determine the Congressional intent behind the enactment of § 10(j).[35] In adding this section, Congress sought to reduce public opposition associated with the release of experimental populations of predators such as wolves. H.Rep. No. 97–567, 97th Cong., 2d Sess. § 5. Congress intended § 10(j) to allow the Secre-

tary, under limited circumstances, to relax certain restrictions, such as taking of an endangered species, that would otherwise be applicable to listed species. *Id.* The legislative history makes it clear that by enacting § 10(j), Congress did not intend to allow reduction of ESA protections to existing natural populations in whole or in part. This is evidenced by the following comments made by the Merchant Marine and Fisheries Committee's House Report:

> To qualify for the special treatment afforded "experimental populations," a population must have been authorized by the secretary for release outside the current range of the species. Populations resulting from releases not authorized by the secretary are not considered "experimental populations" entitled to the special provisions of this subsection.
>
> *The Committee carefully considered how to treat introduced populations that overlap, in whole or in part, [with] natural populations of the same species. To protect natural populations and to avoid potentially complicated problems of law enforcement,* the definition [of "experimental population"] is limited to those introduced populations that are wholly separate geographically from nonexperimental populations of the same species. Thus, for example, in the case of the introduction of individuals of a listed fish species into a portion of a stream where the same species already occurs, the introduced specimens would not be treated as an "experimental population" separate from the nonintroduced specimens. . . . If an introduced population overlaps with natural popula-

---

**34.** The Farm Bureau Plaintiffs assert that there is no scientific basis for the FWS' definition of a wolf "population." Relying on correspondence sent to 47 wolf biologists which contained a statement emphasizing the legal significance of the "population" definition to the reintroduction plan, the Farm Bureaus allege that the definition was formulated based upon legal rather than biological or scientific considerations. While it could be alleged that such a motivation may have existed, Plaintiffs have offered no contrary or competing biological evidence to establish that the FWS' definition is arbitrary and capricious or biologically unsound.

**35.** While many in recent years have voiced criticism of the use and misuse of legislative history, utilizing it to determine the specialized meaning of a statutory phrase is particularly appropriate. *See e.g., Babbitt v. Sweet Home Chapter of Communities for a Great Or.,* 515 U.S. 687, 704, 115 S.Ct. 2407, 2416, 132 L.Ed.2d 597 (1995) (looking to Committee Reports to assist in defining take). *See* Judge Stephen Breyer, *On the Uses of Legislative History in Interpreting Statutes,* 65 S.Cal.L.Rev. 845, 851–52 (1992).

tions of the same species during a portion of the year, but is wholly separate at other times, the introduced population is to be treated as an experimental population at such times as it is wholly separate. *The Committee intends, however, that such a population be treated as experimental only when the times of geographic separation are reasonably predictable and not when separation occurs as a result of random and unpredictable events.*

H.Rep. No. 97–567, 97th Cong., 2d Sess. § 5 (Merchant Marine and Fisheries Committee)(1982) U.S. Code Cong. & Admin.News 1982 p. 2833 (emphasis added). Based upon the foregoing comments, it is clear that Congress, in enacting § 10(j), did not intend to lessen the protections afforded to naturally occurring, or non-introduced, individual members of the same species. In order to give effect to this intent, Congress limited the definition of "experimental population" to such times as when the experimental populations are *wholly* separate geographically from nonexperimental populations of the same species. In the event that an experimental population overlaps, *in whole or in part,* with natural populations of the same species, the introduced specimens can no longer be treated as an "experimental population" separate from the non-introduced specimens and, therefore, full ESA protections must be afforded to all members of the species in the area of overlap.

Defendants argue that the geographic separation provision applies only to "population" overlap and not to overlap with "lone dispersers" or individual members of the species. However, the Congressional history does not support such an argument. As set forth above, the Committee's discussion of this issue specifically refers to the overlap of "individuals" and "specimens" of a particular species as well as populations. Hence, it is clear that Congress did not intend to allow an "experimental population" to exist where it was not *wholly* separate geographically from any natural population, unless the times of geographic separation are "reasonably predictable and not ... a result of random and unpredictable events."

Erroneously focusing only on the definition of "population," Defendants argue that no geographic overlap exists, given their conclusion that no "populations" of wolves exist in the experimental areas. However, Defendants' own statements contained in the administrative record establish that members (or "part") of the natural wolf populations in Montana and/or Canada exist, and will continue to exist, in the experimental population areas.[36] Further, the mere fact that Defendants have drawn a line which purports to ensure "no geographic overlap" between the existing wolf population in Montana and either of the proposed experimental population areas (*see* II.A.3 at 5–118) is insufficient and contrary to law. The legislative history and Defendants' own regulations require that an experimental population may be maintained only when the times of geographic separation from nonexperimental (non-introduced) specimens are reasonably predictable as a result of fixed migration patterns or natural or

**36.** *See* Admin.Rec. II.F.II (Believing that a canid shot near Yellowstone Park in 1992 was "from one of the packs in the Montana population," Mr. Bangs stated, "The significance of a Montana wolf in the Yellowstone ecosystem will be difficult to keep in perspective, as it demonstrates the potential for natural repopulation of Yellowstone. Wolves can disperse for long distances, and with an increasing population in Montana, they may show up *anywhere* in the Northern Rockies. However, one lone wolf showing up somewhere doesn't necessarily mean anything to population recovery.") (emphasis in original); II.A.3 at 5–56 ("There have been and will likely continue to be a few naturally dispersing wolves wandering into the central Idaho and Yellowstone areas. In fact, the *presence of rein-*

*troduced wolves may actually attract and hold some dispersing wolves from northwestern Montana.*") (emphasis added); II.A.3 at 6–67 ("The information we have for Idaho is more indicative of occasional immigration of single wolves *from a breeding population(s)* elsewhere, possibly with intermittent reproduction in some years, but with very low survival of any wolves that travel there or are born there.") (emphasis added); II.I.2–1 (reported wolf sightings in Yellowstone National Park); II.K.ee–1 (reported wolf sightings in Idaho); II.A.3 at 3–9–10 (discussion of wolf presence in Idaho and Wyoming); II.A.3 at 6–84–94 (summary of wolf monitoring programs in Idaho, Montana, and Wyoming).

man-made barriers. H.Rep. No. 97–567, 97th Cong., 2d Sess. § 5; 50 C.F.R. § 17.80(a). This interpretation is consistent with the expressed concerns regarding law enforcement problems created by mixing naturally occurring and introduced specimens of the same species.[37] Obviously, where non-introduced specimens intermingle with introduced specimens of the same species it would be impossible for law enforcement to effectively identify and treat the specimens separately.

▬▬▬ Defendants resolve this problem by treating all wolves found within the boundaries of the designated experimental population areas as nonessential experimental animals. 50 C.F.R. § 17.84(i)(7)(iii). However, such treatment is contrary to law as provided in the Defendants' own regulations:[38]

> The term "experimental population" means an introduced and/or designated population (including any offspring arising solely therefrom) that has been so designated in accordance with the procedures of this subpart but only when, and at such times as the population is *wholly separate geographically* from nonexperimental populations of the same species. Where *part* of an experimental population overlaps with natural populations of the same species on a particular occasion, but is wholly separate at other times, *specimens of the experimental population will not be recognized as such while in the area of overlap.* That is, experimental status will only be

recognized outside the areas of overlap. Thus, such a population shall be treated as experimental only when the times of geographic separation are reasonably predictable; e.g. fixed migration patterns, natural or man-made barriers. *A population is not treated as experimental if total separation will occur solely as a result of random and unpredictable events.*

50 C.F.R. § 17.80(a) (emphasis added).[39] Thus, where artificially introduced and naturally occurring wolves overlap, *all* of the overlapping animals (both introduced and non-introduced) must be accorded the full protections due them as members of an endangered species. The foregoing passage evidences an intent to ensure that ESA protections afforded an endangered animal not be diminished as a result of its presence in the same area as an experimental population. Any other interpretation would fly in the face of the statutory language and legislative history which forms the foundation of species preservation. "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.... If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2782 n. 9, 81 L.Ed.2d 694 (1984) (citations omitted).

▬▬▬ The same problems exist with Defendants' arguments concerning the Farm

---

37. Under the ESA, full protection is afforded to each individual member of an endangered species. Obviously the section dealing with prohibited acts against "any such species" includes individual members of that species and is not limited to "populations." 16 U.S.C.A. § 1538.

38. *See Fort Stewart Schools v. Federal Labor Relations Auth.*, 495 U.S. 641, 654, 110 S.Ct. 2043, 2051, 109 L.Ed.2d 659 (1990) ("It is a familiar rode of administrative law that an agency must abide by its own regulations."); *Saddler v. Department of the Army*, 68 F.3d 1357, 1358 (Fed. Cir.1995) (agency "must abide by its own regulation").

39. The Farm Bureaus and Urbigkits also contend that the experimental population of Canadian wolves was not introduced within that species "probable historic range" in violation of 50 C.F.R. § 17.81(a). They argue that the wolf indigenous to the Yellowstone and central Idaho areas was once recognized as a distinct subspecies, *canis lupus irremotus*, different from the Canadian wolves, and that this subspecific distinction is still relevant in light of the opinion of Dr. Nowak. (*See* Admin.Rec. II.F.10.) However, Plaintiffs' contention on this issue cannot be sustained in light of this Court's previous finding herein that the Defendants' determination regarding the insignificance of subspecific distinctions is not arbitrary and capricious.

Bureaus' and Urbigkits' claims that the experimental population areas are not outside the current range of the gray wolf. In attempting to refute such claims, Defendants ignore the plain language of the statute and attempt to turn the "current range of such species" into the current range or "territory" of naturally occurring "packs" or "populations" of such species. (Defs.' Br. at 26.) Because they contend that no "pack" or "populations" of wolves presently exist in the experimental population areas, Defendants argue that their determination that the experimental population areas are outside the current range of the gray wolf is rationally based and supported in the record. However, the plain language of § 10(j)(2)(A) speaks to the range of the "species" without specific reference to a "population."

Such an interpretation is consistent with the Court's previous analysis regarding the "*wholly* separate" requirement. To further prevent the occurrence of overlap between experimental and nonexperimental populations, Congress required that an experimental population could only be introduced to the extent it was "outside the current range of such species." As evidenced by the legislative history set forth and discussed *supra*, Congress clearly intended to guard against the overlap of introduced and non-introduced "individuals" or "specimens" of a particular species. The requirement that an experimental population only be authorized if it is "outside the current range of the species" is a reflection of that intent. Given Congress' intent, and the Defendants' acknowledgment

that naturally occurring wolves exist in and will likely migrate to the experimental population areas,[40] Defendants' determination that the designated areas are outside the current range of the species is arbitrary and capricious.[41]

■■■■ The National Audubon Plaintiffs contend that the central Idaho reintroduction plan illegally withdraws and denies full ESA protections from wolves naturally migrating to central Idaho in violation of the ESA § 4, 16 U.S.C.A. § 1533. In support of this argument, these Plaintiffs assert that the experimental population rules operate as a de facto "delisting" of the naturally occurring wolves. In response, Defendants point out that their action taken under § 10(j) was not based upon any petition for revision of the wolf's listing. While Defendants argue that § 10(j) provides the authority and criteria for the treatment of an experimental population, § 10(j) only allows the reduction of ESA protections afforded members of the "experimental population" (including any offspring arising solely therefrom). As set forth above, Congress has stated the "experimental population" cannot include naturally occurring wolves. To avoid a conflict in the application of § 10(j) and § 4, the introduction of an experimental population cannot operate as a de facto "delisting" of naturally occurring wolves. Accordingly, to reduce the ESA protections afforded to naturally occurring wolves, or any offspring *not* arising *solely* from an experimental population, the procedure set forth under § 4 must be followed.[42] Therefore, Defendants' blanket treatment of all wolves found within the des-

**40.** *See supra* n. 37; *see also* Admin.Rec. II.I.1(6) at 4:

"The increase in the wolf population in northwestern Montana means more dispersers are available to become lone wolves and travel widely throughout the northern Rockies. Lone wolves have shown up at various locations over the past 15 years, including portions of Idaho, but have been killed or moved on and not contributed to wolf recovery in those fringe areas. Dispersers are at greater mortality risk than pack members. *Yellowstone Park is well within the dispersal range of the breeding population in northwestern Montana.* Dispersing wolves often travel long distances. One wolf from the Glacier Park area dispersed 522 miles

(straight line distance) into Canada, whereas the distance from Glacier Park to Yellowstone is only 300 miles." (emphasis added).

**41.** In light of the foregoing findings regarding the "wholly separate" and "outside the current range" requirements of § 10(j), it is unnecessary for the Court to address any other less significant issues raised in the pleadings with respect to § 10(j) and 50 C.F.R. § 17.81.

**42.** National Audubon Plaintiffs' second cause of action argues that the central Idaho reintroduction plan illegally denies full ESA protections to offspring of naturally migrating wolves and offspring of naturally migrating and artificially in-

ignated experimental population areas as experimental animals is contrary to law.

### CONCLUSION

Mindful of the dedication, talents and money which have been expended in the development and implementation of the wolf recovery program, the Court reaches this decision with the utmost reluctance. The Court is especially mindful of the concerted efforts of the Government and wolf-recovery advocates to accommodate the interests of stockgrowers and others who may be adversely affected by the wolf recovery program. The fact that the program has been responsibly implemented, however, cannot obviate the limitations Congress has imposed upon the application of § 10(j).[43] The laudable ends aspired to by the wolf recovery plan cannot justify the Secretary's impermissible means.

Given the importance of the issues presented and the ramifications of this Order, this Court, *sua sponte*, imposes a stay upon this Order pending appeal.

THEREFORE, it is

**ORDERED** that Defendants' Final Rules establishing a nonessential experimental population of gray wolves in Yellowstone National Park in Wyoming, Idaho, Montana, central Idaho and southwestern Montana are hereby found unlawful and set aside pursuant to 5 U.S.C. § 706; it is further,

**ORDERED** that by virtue of the plan being set aside, Defendants must remove reintroduced non-native wolves and their offspring from the Yellowstone and central Idaho experimental population areas; it is further,

**ORDERED,** *sua sponte,* that the judgment entered hereby is stayed pending appeal.

troduced wolves. Because the definition of an "experimental population" is limited to offspring arising "solely" therefrom, the offspring from naturally occurring wolves, or from a naturally occurring wolf and an experimental wolf, must likewise be afforded full ESA protections to avoid a de facto delisting.

**43.** It is ironic that as a result of the inability to implement an experimental population in these areas, no flexibility in ESA protections will be available to those individuals economically effected by natural wolf recovery. As the adage goes, "Be careful what you wish for, you might just get it."